A94A0039. A. B. C. DRUG COMPANY, INC. v. MONROE.

(447 SE2d 315)

ANDREWS, Judge.

A. B. C. Drug Company, d/b/a Pic N' Save Drugs (ABC) appeals from the judgment entered on the jury's verdict in favor of Monroe and from the denial of its motion for j.n.o.v. or new trial.

1. Viewing the evidence in favor of the jury's verdict, as we must do, *Ailion v. Wade*, 190 Ga. App. 151, 155 (4) (378 SE2d 507) (1989), it was that, on August 8, 1989 about 11:30 a.m., Monroe went to one of ABC's drugstores to buy powdered detergent and liquid Clorox bleach so she could do five loads of laundry. She first picked up the box of detergent which she was carrying under her left arm and proceeded to the aisle where the bleach was stored. Because of the amount of laundry, she needed a half-gallon of Clorox. As she entered the bleach aisle, she noticed that, four or five feet over from the Clorox section, several bottles of another brand of bleach were turned over and some had the labels removed. There was nothing observable out of order in the Clorox section. She was 5′5″ tall and, in order to reach a half-gallon container which she saw on one of the upper shelves, she had to reach over her head.

The manager stated that, on the bleach aisle, the one-gallon containers of Clorox were stacked three or four high in a deep well, separated by dividers. The half-gallon bottles, the smallest container with a handle, were stored on a shelf above the gallon containers and could have been stored over five feet high, although they would not be stacked on the top or next to the top shelf. On the next to the top shelf, the pint bottles of Clorox were shelved, along with powdered Clorox II, a non-bleach product. On the top shelf, half-gallon bottles

of liquid Clorox II were shelved.

As Monroe reached up to get the half-gallon of Clorox with her right hand, she observed that the cap was on the bottle and nothing improper was apparent. She took the handle and had tilted the bottle toward her in order to get it off the shelf when it "gushed" into her face. She was momentarily blinded and immediately let go of the bottle. Her screams brought a woman employee from the meat department who took her to a sink and helped her rinse out her eyes.

Monroe asked for an ambulance but was told by a man who had been called by the woman employee that it was store policy not to call an ambulance and they were not allowed to transport people in their own vehicles. Monroe's sister was called and took her to the emergency room where her eye was irrigated and treated and she was discharged with salve and a patch to cover her right eye. Thereafter, she was seen by an ophthalmologist who eventually performed outpatient surgery to close her right tear duct as a result of the chemical burns.

After Monroe had left with her sister, 30 or 40 minutes after the accident, assistant manager Fulford went to the bleach aisle. The "only thing [he] found was a pint bottle [on the shelf] that did have a loose cap on it" and a small spot of "some liquid" about the size of a half-dollar on the floor. Fulford also said that most spills or fallen bottles were cleaned up within a few minutes and he could not say that this pint bottle was the one involved in the accident.

Douglas, the store manager, explained the stocking procedure for items displayed in the bleach aisle. The stock person would lift each container from its shipping box, price it, drop it back in the box, and when all were priced, lift each one out again and place it on the shelf. If the bottles had handles, the lifting was done by the handle; if not, the bottle would be lifted by its top. During the process of shelving, any defective merchandise would be corrected or not shelved.

Although there was no written policy about inspecting the aisles during the day and no written record of any such inspections, it was ABC's practice that the aisles be visually inspected periodically during the day. This could consist of actually walking the aisles or looking down each one from the end. Manager Douglas usually went up and down the aisles five or six times a day. He was not in the store on the day of Monroe's accident until after it happened, but Assistant Manager Fulford had personally walked the bleach aisle at least once around 9:00 a.m. before Monroe's accident at 11:30 a.m. and had noticed nothing out of the ordinary.

Both Douglas and Fulford acknowledged that a half-gallon bottle of bleach stored above eye level with a loose cap would be a "dangerous condition." Such an incident, however, had not previously occurred in the store and, as acknowledged by Monroe, you could not tell the cap was loose by looking at it.

The complaint alleged ordinary negligence in that ABC (1) failed to "adequately inspect and maintain its merchandise, specifically in allowing the bleach container to remain on the shelf with a loose top" and (2) allowed "a heavy container with caustic qualities . . . to be stocked on an upper shelf" making it more difficult for the customer to control the container and discover the loose top. By amendment, Monroe added her claim that a bottle of Clorox displayed at a dangerous height and with a loose lid or top is not a product which is reasonably suited for the use intended and that ABC failed to honor its implied warranty of merchantability to its customers.

2. "A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion. [Cits.]" *Stone v. Cook*, 190 Ga. App. 11, 12 (1) (378 SE2d 142) (1989).

ABC moved for a directed verdict at the conclusion of plaintiff's case as well as renewing that motion at the conclusion of all the evidence. As to the implied warranty of merchantability, OCGA § 11-2-314 (2) (e), ABC argued that this theory would not apply because a loose cap was a patent defect or a latent defect which was discoverable by the exercise of caution by the buyer. If Monroe had looked at the bottle and checked the lid before attempting to lift it off the shelf, she would have known of the problem with that particular bottle, and the warranty would not apply.

As to the issue of whether ABC had properly inspected the area, ABC argued there was no evidence any employee was in the aisle at the time of the incident so as to have had actual knowledge, nor had there been a showing of constructive knowledge so that ABC should have known.

(a) "For [plaintiff] to recover under a common law negligence theory, there must have been a defective condition on [defendant's] premises, which defect was the cause of [plaintiff's injury] and of which [defendant] had superior knowledge. [Cit.] The law is clear that the basis for an owner's liability for injury occurring to another while on the owner's property is the owner's superior knowledge of the danger or defect which was the proximate cause of the injury. The true ground of liability is the proprietor's *superior knowledge* of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is *known to the owner* or occupant and *not known to the person injured* that a recovery is permitted." (Citations and punctuation omitted.) *Garnett v. Mathison*, 179 Ga. App. 242 (2) (345 SE2d 919) (1986).

There is no evidence here that ABC had actual knowledge of the loose cap. Therefore, any recovery must be based on constructive

knowledge. " 'Constructive knowledge may be inferred where there is evidence that an employee of the owner was in the immediate vicinity of the dangerous condition and could easily have noticed and removed the hazard. (Cit.) Liability based on constructive knowledge may *also* be established by showing that the owner failed to exercise reasonable care in inspecting the premises, but recovery under that approach requires proof of the length of time the dangerous condition was allowed to exist. (Cits.)' (Emphasis supplied.) [Cit.]" *Food Giant v. Cooke*, 186 Ga. App. 253, 254 (1) (366 SE2d 781) (1988). See *Smith v. Wal-Mart Stores*, 199 Ga. App. 808 (406 SE2d 234) (1991).

Because the last inspection of which there was evidence in the record occurred over two hours before the spill, we conclude that a jury issue did exist as to whether ABC should have been aware that the half-gallon had been placed on the wrong shelf and denial of the motion for j.n.o.v. on this ground was not error.

We next consider the issue of whether ABC had superior knowledge of the improper display.

Monroe's claim is that the spill was occasioned because the bottle was on a high shelf, requiring her to tip it in order to get it off the shelf. Monroe was aware that she was tipping a bottle containing a caustic liquid toward her face in order to get it off the shelf. " 'There was no duty to warn her of a condition of which she had knowledge at least equal to that of defendants. (Cits.)' " *Smith*, supra at 810.

Further, the store's practice was not to shelve half-gallons of bleach, as opposed to Clorox II, on the top or next to the top shelves. Monroe has failed to show that ABC had stacked the bleach in an inherently dangerous fashion, *Colonial Stores v. Donovan*, 115 Ga. App. 330, 331 (2), (3) (154 SE2d 659) (1967), or had knowledge superior to her own that a half-gallon of bleach was placed on a higher shelf. *J. H. Harvey Co. v. Johnson*, 211 Ga. App. 809 (440 SE2d 548) (1994); *Smith*, supra.

As to the loose cap, Monroe looked directly at it as she was lifting the bottle off the shelf and noticed nothing wrong with it. Therefore, even if hourly inspections were undertaken by ABC, there was nothing visible which would have alerted store personnel to the loose cap. Compare *Wallace v. Sears, Roebuck &c.*, 196 Ga. App. 221 (396 SE2d 41) (1990) (display of loose skateboards by store resulted in patron being struck by child using one in store aisles and created jury question).

(b) As to the implied warranty theory, " '[t]he law of implied warranty will not avail against patent defects, nor against latent defects which are either disclosed or are discoverable by the exercise of caution on the part of the purchaser.' " *Smith v. Northeast Ga. Fair Assn.*, 85 Ga. App. 32, 36 (7) (67 SE2d 836) (1951). See *Wilkinson v. Rich's*, 77 Ga. App. 239, 244 (2) (48 SE2d 552) (1948); *Jones v.*

*Knightstown Body Co.*, 52 Ga. App. 667, 672 (6) (184 SE 427)' (1936).

Therefore, we conclude that the court, as a matter of law, erred in not granting ABC its motion for j.n.o.v.

*Judgment reversed. Beasley, P. J., concurs specially and Johnson, J., concurs in the judgment only.*

BEASLEY, Presiding Judge, concurring specially.

Although I concur in reversal of the judgment, I do so on the following analysis.

Plaintiff presented her case on two theories, premises liability and breach of implied warranty of merchantability, as set out in the pretrial order and the charge to the jury. Defendant objected to the latter as being inapplicable.

The evidence fails to show a breach of the duty of the premises owner or occupier to maintain the premises in a safe condition. The majority holds that there was a jury issue as to whether defendant should have been aware that the half-gallon had been placed on the "wrong" shelf. Even if the half-gallon was on a high enough shelf so as to require plaintiff to reach above her head to get it, this would not constitute a "defect" in the premises. As noted by the majority, this is not an inherently dangerous stacking. Even if the proprietor put it on that shelf, as opposed to a customer's placing it there after removing it from another shelf, it was not in such a place "as to threaten injury to those visiting the store who are in the exercise of ordinary care for their own safety." *Parsons, Inc. v. Youngblood*, 105 Ga. App. 583, 585 (125 SE2d 518) (1962).

The problem is that the cap was loose. But it is not a question of equal knowledge of this irregular condition. There is no evidence that defendant knew or should have known of this condition of the product it offered for sale. It does not have a duty to check the shelved containers periodically to assure that the container caps are tight. The loose condition of the cap in plaintiff's case wold not have been detectable by defendant's visual inspection along the aisles for defects or dangerous conditions any more than it was detectable by plaintiff's looking at it. It was loose, not off.

Also, the defendant did not owe a duty to check the tightness of every container cap when shelving it, in the absence of any evidence that looseness was a reasonably foreseeable condition. As the shelf-stocker testified, the merchandise is lifted out of the box, price-marked, dropped back down in the box, and after all the pricing is done, lifted out again and shelved. He testified that this activity would cause leakage or splattering if the cap was loose.

Assuming that the container of liquid Clorox, with a loose cap, sitting on a shelf with other similar merchandise, constitutes a "defect" in the premises so they were not "safe," there is no evidence of

negligence on defendant's part such as to create liability for plaintiff's injury. See *Cook v. Home Depot*, 214 Ga. App. 133 (447 SE2d 35) (1994).

Another theory was put to the jury as well, and the verdict does not indicate which theory was the basis for the finding of liability. OCGA § 11-2-314 imposes an implied warranty of merchantability on goods sold by merchants such as defendant. According to subsection (2) (e), in order to be merchantable, goods must be "adequately contained, packaged, and labeled as the agreement may require." Here the Clorox was not adequately contained and packaged; it leaked out when the container was tipped. To say that a purchaser has a duty to assure the tightness of the top before removing it from the shelf creates an unreasonable burden on the shopper, absent some warning such as regularity that the top may be loose.

However, since there was no sale in this case, the plaintiff lacks the necessary privity with the seller to be entitled to the warranty. "Georgia law requires a showing of privity between the injured person and the seller of the product before a claim based upon an implied warranty may be brought. [Cit.]" *Morgan v. Mar-Bel, Inc.*, 614 FSupp. 438, 441 (N.D. Ga. 1985). See *Stewart v. Gainesville Glass Co.*, 131 Ga. App. 747, 751 (206 SE2d 857) (1974), affirmed 233 Ga. 578 (212 SE2d 377) (1975); *Lamb v. Ga.-Pacific Corp.*, 194 Ga. App. 848, 850 (4) (392 SE2d 307) (1990). "By statute, the UCC warranties can only be made by a *seller* of goods and those warranties can only be extended either to *the buyer* or to those who have a specified *relationship with the buyer*. See OCGA § 11-2-318. The *Stewart* opinion recognizes that, for purposes of imposing liability for a breach of the UCC warranties, it is the applicable specific statutory provisions of the UCC and not general legal principles that are controlling as to the privity requirement and any exceptions thereto." *Decatur North Assoc. v. Builders Glass*, 180 Ga. App. 862, 864 (1) (350 SE2d 795) (1986).

This case differs from *Fender v. Colonial Stores*, 138 Ga. App. 31 (1A) (225 SE2d 691) (1976), in that privity of contract was created there by plaintiff's act of taking physical possession of the merchandise in the self-service store, with the intent to purchase it. The customer was at the check-out counter and lifted the bottles from her cart to present to the checker to ring up when one of them exploded. Here the plaintiff was merely in the act of taking physical possession when the liquid spilled and she dropped the container. Privity had not yet arisen.

I note that plaintiff did not pursue a theory of liability against the manufacturer for offering for sale a defective product, which would be one containing a manufacturing defect, a design defect, or a defect of inadequate instructions or warnings. OCGA § 51-1-11. See

*Hunt v. Harley-Davidson Motor Co.*, 147 Ga. App. 44 (248 SE2d 15) (1978). The statute does not allow such a claim against the seller, however. See Maleski, Georgia Products Liability, 2d ed. (1993), § 2-3, and cases cited therein. The action might proceed upon an allegation that the manner of capping the caustic product was a defect in that there was no seal either on the container itself or on the cap, so as to prevent tampering or leakage. As to whether this intended purchaser should have standing to bring such an action, see Maleski, supra at § 8-5.

DECIDED JUNE 16, 1994 —
RECONSIDERATION DENIED JULY 27, 1994 —

*Walker & Sweat, Forrest W. Sweat, Jr., Craig R. White*, for appellant.

*Chambers, Rice & Rogers, Charles B. Rice, Delman L. Minchew*, for appellee.