**EMJ CORPORATION, Plaintiff,**

v.

**LATICRETE INTERNATIONAL, INC., Defendant.**

**No. 3:96–cv–66(HL).**

United States District Court,
M.D. Georgia,
Athens Division.

July 31, 1996.

---

this order, Defendant's Motion to Dismiss is **DENIED.**

## I. INVOLUNTARY DISMISSAL

■ Rule 12(b)(6) of the Federal Rules of Civil Procedure permits the defendant in a lawsuit to respond to the plaintiff's complaint by showing that the pleadings fail to state a claim upon which relief can be granted and making a motion for dismissal of the claim. In considering a motion for involuntary dismissal, the Court is required to accept as true all facts alleged in the pleadings and to construe them in the light most favorable to the plaintiff. "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him to relief." *Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1484 (11th Cir.1994). Even when the facts alleged in the pleadings fail to support a cause of action, the Court should afford the plaintiff an opportunity to amend its pleadings in order to state a claim. *Sosa v. Coleman*, 646 F.2d 991, 993 (5th Cir.1981).

## II. FACTS

Plaintiff EMJ filed its first complaint against Laticrete in the Superior Court of Clarke County, Georgia on March 20, 1996, listing one count of breach of warranty. It was promptly removed to federal court by the defendant. In response to Laticrete's Motion to Dismiss, EMJ has since filed its First Amended Complaint, setting forth a new claim for negligent misrepresentation. Laticrete's Motion to Dismiss concerns the breach of warranty claim. The facts alleged by both of EMJ's pleadings, which for purposes of this motion will be considered as true and construed in a light favorable to the Plaintiff, are as follows.

On or about July 25, 1994, EMJ, as general contractor, subcontracted with its tile subcontractor ("Subcontractor") for labor and material to install tile flooring at the Georgia Square Mall in Athens, Georgia (the "Mall"). As part of the Subcontractor's agreement, it proposed to use materials provided by Laticrete to secure the new tile to the existing floor at the Mall. EMJ obtained the approval of the project architect to use the product,

D. Steven Henry, Dallas, TX, R. Daniel Douglass, Atlanta, GA, for plaintiff.

K. David Steele, Atlanta, GA, Robert Lee Crewdson, Atlanta, GA, for defendant.

### *ORDER*

LAWSON, District Judge.

Before the Court is Defendant Laticrete International's (Laticrete) Motion to Dismiss, filed May 20, 1996. Plaintiff EMJ Corporation (EMJ), a general contractor which was involved in a construction project at the Georgia Square Mall in Athens, Georgia, brought suit in the Superior Court of Clarke County, Georgia, against Laticrete, a Connecticut corporation in the business of producing building materials. Laticrete removed the action to the United States District Court for the Middle District of Georgia on the basis of diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332, and now moves this Court to dismiss the suit for failure to state a claim upon which relief can be granted. For the reasons set forth in

which it had decided to use because of Laticrete's representations concerning the quality of its products and because of the five year systems warranty which Laticrete provided when its materials were used.

On August 10, 1994, the products arrived at the Mall, and the subcontractor began to install the new tile, using Laticrete setting materials and grout bed materials to secure the tile. It soon became apparent that the Laticrete materials were not properly securing the new tile to the existing floor, and Laticrete was immediately notified of the problem. On or about August 11, 1994, representatives of Laticrete arrived at the Mall to meet with EMJ's representatives, run tests on the products, and inspect the installation procedures being used. Laticrete recommended the use of a different Laticrete product in order to address the problem. After submitting data on the new product to the architect for review, EMJ substituted the product which Laticrete recommended. On August 12, 1994, Laticrete sent a facsimile message to the project site with specific instructions for installation of the new products, along with a direct affirmation from the company that the products would be covered by the standard five year warranty.

On August 15, the new products arrived at the Mall. After removing the previously installed grout bed, the subcontractor immediately began installing the tile using the substituted products and following the installation procedures described by Laticrete. For the next month, Laticrete's representatives would periodically come to the Mall to examine and monitor the progress of the work and ensure that the installation process was performed according to the instructions. In September of 1994, EMJ and the subcontractor again observed that there were possible problems with the substituted Laticrete product. The new tiles were not properly adhering to the existing floor.

EMJ again brought the adherence problem to the attention of Laticrete's representative on site on September 15, 1994. After inspecting the flooring on that morning, the Laticrete representative stated that there was no problem with using the Laticrete product to secure the floor tiles, and that the

lack of adherence would be resolved once the products had additional time to cure. EMJ insisted that Laticrete test the new system again to make sure that the substituted products would work with the specific tile application being attempted. Laticrete agreed to take samples of its products and the existing tile for testing. In response to EMJ's concerns, the Laticrete representative again confirmed that the subcontractor's installation was satisfactory and in accordance with the instructions given. Later that afternoon, the Laticrete representative informed EMJ that it should continue to install the new tile on the existing floor with the substituted products recommended by Laticrete. Relying on the repeated representations by Laticrete, EMJ instructed its subcontractor to continue with the tile installation.

On September 23, 1994, Laticrete notified EMJ in writing that based upon its observations at the Mall, the five year Laticrete Warranty was effective. On September 27, 1994, Laticrete notified EMJ that the initial shear bond test performed by Laticrete showed that the installation was acceptable and that there were no contaminants present which would preclude further use of the Laticrete product. On September 29, Laticrete notified EMJ that a second shear bond test showed that the installation was acceptable. On October 14, 1994, Laticrete also confirmed that the third shear bond test showed acceptable results.

In the summer of 1995, the tile in the Mall began to delaminate. EMJ requested Laticrete to inspect the problem and honor its five year warranty. Representatives of Laticrete and EMJ met at the Mall on August 21, 1995, to observe the delaminating tile, and Laticrete again took samples for testing. On September 11, 1995, Laticrete notified EMJ that it believed that there might be "traces of contaminants" on the existing floor. Laticrete's representative did, however, again admit that the cleaning procedures recommended by Laticrete in August, 1994, had been followed, and that the tile had been installed in accordance with Laticrete's instructions.

Throughout the fall of 1995 EMJ attempted to get Laticrete to perform its obligations

under the five year warranty, while Laticrete delayed in making a commitment. Despite its admissions that the floor had been installed according to instructions and its representations that the installation would be covered by its five year warranty, Laticrete notified EMJ that it would not honor its warranty obligations.

EMJ filed suit on March 20, 1996, seeking damages for breach of warranty in excess of $500,000. After removal to federal court, Laticrete filed its motion to dismiss, claiming that because it was not in direct privity with EMJ, it had no warranty obligations under Georgia law. EMJ filed, along with its brief in opposition to defendant's motion, an amended complaint restating the breach of warranty claim and adding a count of negligent misrepresentation.

## III. JOHN JONES' HAMMER: THE PRIVITY REQUIREMENT IN GEORGIA

■ Defendant Laticrete International argues that EMJ's breach of warranty claim should be dismissed because under Georgia law a buyer cannot enforce an implied or express warranty against a manufacturer where there is no direct privity of contract between the buyer and the manufacturer. In most American jurisdictions, as the Uniform Commercial Code became the standard guide for commercial transactions, the strict privity requirement disappeared, to be replaced by a broader application of warranties and an emphasis on consumer protection; however, the Georgia courts held on to the principle of privity even after Georgia adopted the U.C.C. in 1962. In *Stewart v. Gainesville Glass Co., Inc.*, 131 Ga.App. 747, 206 S.E.2d 857 (1974), the Court of Appeals reluctantly ruled that under Georgia law a consumer who purchased windows from a local dealer could not enforce the manufacturer's ten year warranty because he had no privity with the manufacturer. Judge Evans explained the impact of the court's ruling in a special concurrence: "To make it very plain, if John Jones purchases goods from a hardware store, and the goods are completely worthless, he cannot go back on the manufacturer, *simply because he did not purchase*

*directly from the manufacturer.* If some middleman sells the product to the purchaser, as is almost always the case, then the purchaser may as well forget express warranty or implied warranty by the manufacturer, because of a lack of privity." *Id.*, 206 S.E.2d at 860 (emphasis in original). The decision of the Court of Appeals was affirmed in a one-paragraph opinion by the Supreme Court of Georgia. 233 Ga. 578, 212 S.E.2d 377 (1975). This anachronistic principle has not since been overruled or questioned, and has been cited as recently as 1994, in *A.B.C. Drug Co., Inc. v. Monroe*, 214 Ga.App. 136, 447 S.E.2d 315 (1994).

## IV. BOBBY JONES' RIFLE: THE LIMITS OF THE PRIVITY REQUIREMENT

Although no case has explicitly modified the decision in *Stewart* or attempted to revoke the privity requirement, there is a line of cases which may create an exception. In *Jones v. Cranman's Sporting Goods*, 142 Ga. App. 838, 237 S.E.2d 402 (1977), the Court of Appeals considered the case of a sportsman who had purchased a defective rifle from a sporting goods store and was injured when the rifle exploded. The court enforced the warranty despite the lack of privity, applying the principle of *Ford Motor Co. v. Lee*, 137 Ga.App. 486, 224 S.E.2d 168 affirmed in part, reversed on other grounds, 237 Ga. 554, 229 S.E.2d 379 (1976), which held that an automobile manufacturer would be in privity with a purchaser if it issued a warranty through its authorized dealer as a part of the sale. In *Jones*, the warranty was not issued directly through an authorized dealer, but was included in the papers that came with the weapon. Nevertheless, the court found the case to be analogous to *Lee*. "The weapon here was 'fully guaranteed' by the distributor to the ultimate consumer. As such it became part of the bargain of sale and thus privity existed." *Jones*, 237 S.E.2d at 406.

It is difficult to reconcile the holding of *Jones* with the ruling of *Stewart*. The exception carved out seems to eliminate the privity requirement almost entirely, since a purchaser could easily characterize any warranty as a part of the "bargain of sale" and thus

establish privity with the manufacturer, but despite the *Jones* decision, courts still decline to enforce warranties for lack of privity. *Jones* seems to be an anomaly, while *Lee* itself is more easily reconciled to the privity cases. The key distinction in *Lee*, which distinguishes it from *Stewart*, is that the warranty was issued by the manufacturer through an authorized dealer, as a part of the sale, and thus the manufacturer had entered indirectly into the bargaining process in order to induce the purchaser to complete the purchase. In essence, the authorized dealer acted as an agent of the manufacturer in issuing the warranty, making the manufacturer itself a party to the contract.

## V. EMJ'S FLOOR: PRIVITY IN THE BARGAIN

Laticrete's privity defense does not free it from its warranty obligations because, if the allegations of the pleadings are accepted as true, Laticrete was in a relationship of direct privity with EMJ. When the first Laticrete product failed to hold the floor tiles, EMJ contacted representatives of Laticrete, who recommended a different Laticrete product. EMJ requested confirmation that Laticrete would warrant its product, and received written assurance that Laticrete would warrant its materials' performance as outlined in its five-year warranty, provided that EMJ followed the manufacturer's specified installation criteria. The complaint alleges a process of bargaining between Laticrete and EMJ which resulted in a contractual relationship between the two companies. EMJ agreed to try a second Laticrete product after the first product failed, in exchange for assurances from Laticrete that its product would be warranted. Laticrete agreed to give its warranty, provided EMJ followed its instructions. Therefore the warranty given to EMJ, unlike the standard Laticrete warranty buried in its product data sheets, was the result of a direct and express bargain,

and Laticrete is in privity to EMJ with regard to its warranty.

The facts alleged by EMJ go beyond the facts of *Lee*. The warranty was issued not by an authorized dealer, but by the manufacturer itself, and was an essential part of the bargain. It is as if before going to the hardware store John Jones, looking for a very particular sledge-hammer—one light enough for him to handle but heavy enough to drive a spike—sought assurance from the hammer company that its product would meet his needs. The hammer company sent Mr. Jones a letter saying, "We stand behind our product. If you purchase our sledge-hammer, we will guarantee that it will weigh exactly nine pounds, or you will get your money back." Mr. Jones then went to a hardware store, with the letter in hand, and purchased a hammer. The warranty from the company was consideration, and his purchase of the hammer was acceptance of the offer from the manufacturer. Because there is a contract formed between the manufacturer and the purchaser in this transaction, there is privity, and when Mr. Jones returns to say "This nine-pound hammer is a little too heavy," the company will have to honor its bargain.

EMJ has alleged facts in its complaint which, if proved, will establish privity of contract with Laticrete sufficient to sustain a cause of action for breach of warranty. Therefore, Defendant's Motion to Dismiss is **DENIED** and EMJ may proceed with its suit for breach of warranty as well as with the negligent misrepresentation claim stated in its First Amended Complaint.

SO ORDERED.